UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WHITNEY EQUIPMENT COMPANY, INC.,

    Plaintiff,

v.

TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA,

    Defendant.

NO. C18-1634RSL

ORDER GRANTING IN PART CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter comes before the Court on the parties' cross-motions for summary judgment. Dkt. # 28 and Dkt. # 31. The Court, having reviewed the memoranda, declarations, and exhibits submitted by the parties,[1] finds as follows:

## BACKGROUND

Defendant Travelers Casualty and Surety Company of America ("Travelers") provided Employee Theft coverage to plaintiff Whitney Equipment Company, Inc., from June 1, 2016, to the present. The relevant coverage provision includes Travelers' promise to reimburse Whitney for its "direct loss of . . . Money . . . directly caused by Theft . . . committed by an Employee"

---

[1] This matter can be resolved on the papers submitted. The parties' requests for oral argument are DENIED. Travelers' evidentiary objections are overruled.

ORDER GRANTING IN PART CROSS-
MOTIONS FOR SUMMARY JUDGMENT - 1

and discovered by the insured during the policy period. Dkt. # 32-1 at 51. "Theft" is defined as "the intentional unlawful taking of Money . . . to the Insured's deprivation." Dkt. # 32-1 at 64. In 2017, Whitney discovered that its controller, Patricia Davis, had been using a company credit card for personal use. In a negotiated settlement signed on May 25, 2017, Davis agreed to separate from Whitney, repay $41,288 (plus accounting and legal fees), and release all claims against the company.

Shortly thereafter, Whitney discovered that Davis had intentionally and purposefully manipulated the company's enterprise resource planning ("ERP") system to reduce project costs and increase company assets. The effect of these unauthorized and improper entries was to overstate Whitney's profitability and trigger the company's bonus policy, pursuant to which Whitney pays a predetermined percentage of profits to its employees in the form of bonuses and a company-wide paid vacation. Davis was aware of both the policy and the process through which Whitney's owners reviewed the company's financials and determined whether the bonus policy was implicated: she had, in the past, participated in the owners' meetings, presenting the financial data and forecasts and taking part in the discussion. In 2015, based solely on Davis' fraudulent representations regarding the company's year-to-date financials and yearly performance forecasts, Whitney allocated and paid $138,207.32 for a company-wide trip to Hawaii, $48,397.12 in 2015 for employee bonuses, and $48,169.73 in 2016 for employee bonuses. Dkt. # 33 at ¶ 19.

While investigating the fraudulent ERP entries, Whitney discovered additional unauthorized credit card charges by Davis.

Whitney notified Travelers of a potential claim in July 2017 and filed a proof of loss

ORDER GRANTING IN PART CROSS-
MOTIONS FOR SUMMARY JUDGMENT - 2

totaling $393,885 in May 2018. Dkt. # 30-1 at 138.[2] Travelers determined that its policy covers Davis' improper credit card use, but that the vacation and bonus payments do not fall within the policy's definition of "Theft" and/or were not directly caused by a covered "Theft." Dkt. # 30-1 at 63-64. Travelers also cited a number of exclusions to justify its coverage denial. Whitney initiated this lawsuit in October 2018, asserting breach of contract, breach of duty of good faith, negligence, Insurance Fair Conduct Act ("IFCA"), and Consumer Protection Act ("CPA") claims against Travelers. Dkt. # 1-2 and Dkt. # 18. Both parties seek a summary determination of the coverage issue in their favor. In the alternative, Travelers seeks judgment on the bad faith claims on the ground that its coverage determination, even if not correct, was reasonable.

## ANALYSIS

**A. Policy Interpretation Under Washington Law**

> In Washington, insurance policies are construed as contracts. An insurance policy is construed as a whole, with the policy being given a fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance. If the language is clear and unambiguous, the court must enforce it as written and may not modify it or create ambiguity where none exists. If the clause is ambiguous, however, extrinsic evidence of intent of the parties may be relied upon to resolve the ambiguity. Any ambiguities remaining after examining applicable extrinsic evidence are resolved against the drafter-insurer and in favor of the insured. A clause is ambiguous when, on its face, it is fairly susceptible to two different interpretations, both of which are reasonable.

Panorama Village Condominium v. Allstate Ins. Co., 144 Wn.2d 130, 137 (2001) (internal citation and quotation marks omitted). See also Kut Suen Lui v. Essex Ins. Co., 185 Wn. 2d 703,

---

[2] The original claim covered losses incurred from 2011 to 2017. Whitney has since reduced the amount of the losses for which it seeks covered to $234,774.17 as stated in the text.

ORDER GRANTING IN PART CROSS-
MOTIONS FOR SUMMARY JUDGMENT - 3

710, 712 (2016). In order to determine whether coverage exists, the Court applies a two-step process. First, the insured bears the burden of showing that the loss falls within the scope of the policy's insuring agreement. If it does, the insurer bears the burden of showing that specific policy language excludes the loss in order to avoid coverage. Probuilders Specialty Ins. Co. v. Coaker, 145 F. Supp.3d 1058, 1063 (W.D. Wash. 2015) (citing McDonald v. State Farm Fire & Cas. Co., 119 Wn.2d 724, 731 (1992)).

**B. Scope of the Coverage Provision**

In this case, the first step of the analysis is to determine whether Whitney's expenditure of funds on bonuses and a company-paid vacation based on Davis' manipulation of Whitney's financial data falls within the Employee Theft provision. Travelers does not dispute that Whitney lost money, that the loss was discovered by the insured during the policy period, or that Davis was an employee. Nor does Travelers provide any evidence to contradict Whitney's showing that Davis' malfeasance was intentional. The issues, then, are whether Davis' conduct constitutes theft and whether her conduct directly caused a direct loss of money.

**1. "Theft"**

For purposes of the insuring agreement, theft is defined as "the intentional unlawful taking of Money . . . to the Insured's deprivation." Dkt. # 32-1 at 64. The average person purchasing insurance would read this definition to include Davis' conduct. Davis set out to enrich herself at Whitney's expense, intentionally manipulating the company's financial data to "earn" payments to which she had no right. Although her scheme was more complicated than

reaching into the till to grab some cash[3] or turning in a fraudulent vendor receipt to pocket the money,[4] if the contract terms are given their fair, reasonable, and sensible construction, Davis intentionally and unlawfully took Whitney's money.

Travelers argues that the word "taking" requires a physical act on Davis' part to affirmatively seize, grab, or capture the money she stole. Dkt. # 28 at 9-10. According to Travelers' reading of various dictionaries, there can be no "taking" if the employer is tricked into turning over the money. To make this argument, Travelers ignores the many definitions of "take" and "taking" that focus on the receipt or acceptance of an item. It also ignores the definitions that use passive terms such as "to get into one's possession" and "to obtain money from, especially fraudulently." See https://www.merriam-webster.com/dictionary/take. The policy definition of "Theft" is not as limited as Travelers would now prefer, nor would an average insurance purchaser have any reason to suspect that the term "employee theft" encompasses only smash and grab crimes.[5]

Travelers also argues that Whitney's payments to third party vendors for the Hawaii trip

---

[3] S&K Motors, Inc. v. Harco Nat'l Ins. Co., 151 Wn. App. 633, 635 (2009) (employee theft policy covered losses associated with employee's failure to deliver a customer's cash payments to the employer).

[4] See Karen Kane Inc. v. Reliance Ins. Co., 202 F.3d 1180 1182 (9th Cir. 2000) (employee dishonesty policy covered losses associated with a scheme whereby the employee falsified invoices for goods the employer neither ordered nor received).

[5] The cases on which Travelers relies are distinguishable. In Pine Belt Auto., Inc. v. Royal Indem. Co., 2008 WL 4682582 (D.N.J. Oct. 21, 2008), and Tesoro Ref. & Mktg. Co. LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 96 F. Supp.3d 638 (W.D. Tex. 2015), no part of the insureds' claimed losses were ever obtained, possessed, or otherwise taken by the dishonest employees. It is not clear from the decisions why the employees falsified documents to benefit unrelated third parties, but there is no indication that they received any sort of pay out as a result of their fraud.

ORDER GRANTING IN PART CROSS-
MOTIONS FOR SUMMARY JUDGMENT - 5

do not constitute theft because Davis did not end up with possession of those funds. This argument is curious in light of Travelers' acknowledgment that the policy covers losses arising from Davis' improper use of a company credit card. That aspect of Davis' misconduct resulted in Whitney voluntarily transferring funds to the credit card company to clear what it incorrectly thought was its debt. Those payments did not go to Davis, but they indirectly enriched her via the products and services she obtained with Whitney's money. The same can be said of the money paid for the vacation Davis enjoyed.

Finally, Travelers argues that bonuses Whitney paid to or vacation expenses it paid for employees unrelated to Davis do not fall within the coverage provision because Davis did not personally possess or benefit from the money she steered toward her co-workers. The policy does not require that the unfaithful employee be the sole beneficiary of the theft, nor does it limit coverage to the amount the employee pocketed. Rather, coverage is triggered by an employee's "intentional unlawful taking of Money . . . to the Insured's deprivation." As discussed above, Davis intentionally and without legal entitlement took money from Whitney. The fact that her chosen method of separating Whitney from its money incidentally benefitted third parties at Whitney's expense does not take the loss outside the scope of coverage: it simply means that Davis caused injury to Whitney that was disproportionate to the benefit she received. The insurer promised to cover Whitney's loss, however, not the employee's gain.

**2. Causation**

The Employee Theft provision obligates Travelers to pay for Whitney's "direct loss of . . . Money . . . directly caused by Theft . . . committed by an Employee . . . ." Dkt. # 32-1 at 51. Travelers argues that the loss at issue here - the payment of bonuses and vacation expenses based

ORDER GRANTING IN PART CROSS-
MOTIONS FOR SUMMARY JUDGMENT - 6

on Davis' fraudulent representations - was not direct because the payment was "contingent on the occurrence of a series of events that were not inevitable." Dkt. # 28 at 15 (quoting <u>Direct Mortg. v. Nat'l Union</u>, 625 F. Supp.2d 1171, 1177 (D. Utah 2008)). In particular, Travelers asserts that Whitney made an independent business decision to award bonuses and vacations as a reward for good work during the year, to improve employee morale, and/or to "otherwise benefit[] the company in a non-monetary fashion." Dkt. # 28 at 16. The decision, Travelers argues, was not compelled by Davis' fraudulent data entries and is therefore an intervening cause of the loss.

Traveler's conjecture regarding what benefits Whitney hopes to achieve through its bonus/vacation policy is wholly unsupported. The factual underpinnings of its argument that there was an independent and intervening decision between Davis' fraud and Whitney's loss consist of words and phrases used by Whitney's forensic accounting firm and others in describing how the claimed loss occurred. These sources used terms such as "primary reason" and "key indicator" to explain how Davis' data entry manipulations resulted in the award of bonuses and vacations. Travelers apparently interpreted these phrases to mean that Davis' overstatement of current and expected profits influenced, but was not the only factor, in Whitney's evaluation of whether to award benefits. Dkt. # 42-1 at 5-8. Travelers also focuses on the use of the words "decision" and "decides" to argue that the record "undisputedly demonstrates Whitney made 'decisions' on the bonus/vacation claim, thereby establishing it was not a 'direct loss' as required by the Policy and law." Dkt. # 28 at 18.

It is not clear what, if any, investigation Travelers made into Whitney's bonus policy, how it was structured, or how it is implemented, but the record does not reveal any factor that

ORDER GRANTING IN PART CROSS-
MOTIONS FOR SUMMARY JUDGMENT - 7

was considered in making the awards under Whitney's policy other than Davis' fraudulent financials and forecasts. See Dkt. # 33 at ¶¶ 8 and 11; Dkt. # 35 at ¶¶ 8-10. Nor does the record show that the relevant "decision" involved anything other than ascertaining that the fraudulent numbers triggered Whitney's bonus/vacation policy. Travelers' supposition regarding how and why awards were made does not create an issue of fact regarding the causal relationship between Davis' misrepresentations and the loss.[6]

      Even if the award of bonuses and vacations were inevitable under Whitney's policies once Davis presented her falsified financials and forecasts at the owners' meeting, Travelers argues that the claimed loss was not direct because there was a substantial delay between her manipulation of the ERP system and the payouts. There is no definition of "direct loss" or "directly caused" in the policy. Washington cases interpret "direct" in the context of insurance coverage as "without any intervening agency or step: without any intruding or diverting factor." Pinnacle Processing Group, Inc. v. Hartford Cas. Ins. Co., 2011 WL 5299557, at * 5 (W.D. Wash. Nov. 4, 2011) (quoting Moeller v. Farmers Ins. Co. of Wash., 155 Wn. App. 133, 143 (2010)). See also Fed. Dep. Ins. Corp. v. Arch Ins., 2017 WL 5289547, at *4 (W.D. Wash. Nov. 13, 2017). A delay, without more, is neither an intervening step nor a diverting factor. In this case, Davis intentionally manipulated Whitney's financial data and forecasts to make it appear

---

[6] To the extent Travelers is arguing that the owners' predictable and foreseeable application of corporate policy is a contingent or intervening event, the argument is rejected. If that were the case, only thefts that the employee could accomplish entirely alone would be covered because losses that involved the unwitting participation of other employees or entities fulfilling their designated corporate roles - such as the bookkeeper reviewing a reimbursement request before payment or the warehouse manager fulfilling an order for goods - would be deemed to involve a contingency because those employees could always opt not to perform their duties. Not only would such an interpretation go against decades of case law regarding what is and what is not covered under an employee theft policy, but it is inconsistent with Travelers' handling of the credit card claim in this case.

ORDER GRANTING IN PART CROSS-
MOTIONS FOR SUMMARY JUDGMENT - 8

that the company had earned or would earn profits that hit the benchmarks set forth in Whitney's bonus policy. Davis was playing something of a long game, manipulating a database that she knew would eventually cause certain corporate actions. Her scheme worked as planned, triggering the bonus policy and enriching herself at Whitney's expense. Travelers has failed to show any intervening agency or occurrence: the entire course of events was entirely foreseeable (and was, in fact, counted on by the dishonest employee).

Travelers cites no policy language that would support the proposition that delay, in and of itself, disqualifies a loss from coverage. The word "direct" simply describes the necessary causal relationship, namely "a cause which in a direct sequence, unbroken by any independent cause, produced the injury complained of and without which such injury would not have happened." Hanson PLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, 58 Wn. App. 561, 573 (1990).[7] That standard is easily satisfied here. The fact that there was a delay between Davis' manipulation of the financial data and the payment of the bonuses and/or vacation expenses was an anticipated part of the fraud and is not an intervening event that breaks the causal chain.[8]

The Court finds that Whitney's payments for bonuses and company-wide vacations based solely on Davis' fraudulent representations regarding the company's financial situation and forecast is a loss that falls within the Employee Theft coverage provision.

---

[7] As Travelers recognizes, this analytical framework represents a proximate cause standard. Dkt. # 28 at 21. See Moeller, 155 Wn. App. at 143 ("[D]irect refers to a causal relationship, and is to be interpreted as limited to the harm resulting from an immediate or proximate cause as distinguished from a remote cause.") (internal alteration and quotation marks omitted).

[8] Travelers' reliance on cases in which the insured suffered no loss as a result of the employee's conduct, but rather as a result of third-party contractual obligations or in settlement of third-party claims is misplaced, as is its reliance on cases that interpret "direct" to mean something other than proximately caused.

ORDER GRANTING IN PART CROSS-
MOTIONS FOR SUMMARY JUDGMENT - 9

**C. Exclusions**

In its coverage determination letter, Travelers relied upon Exclusions D, J, K, and L. Dkt. # 30-1 at 64-65. In its motion for summary judgment, Travelers abandons its arguments regarding Exclusions D and K, but argues that Exclusions O and R bar coverage for some or all of Whitney's claims. Dkt. # 28 at 22-23.

As an initial matter, Whitney argues that Travelers is estopped from relying on Exclusions O and R because they were not mentioned in its coverage letters. WAC 284-30-380 precludes insurers from "deny[ing] a claim on the grounds of a specific policy provision, condition, or exclusion unless reference to the specific provision, condition, or exclusion is included in the denial." The regulation itself does not have preclusive effect (see Hayden v. Mut. of Enumclaw Ins. Co., 141 Wn.2d 55, 61-62 (2000)), but traditional forms of estoppel apply in the insurance context. "Under these forms of estoppel, insureds must demonstrate either that they suffered prejudice or that the insurer acted in bad faith when the insurer failed to raise all its grounds for denial in its initial denial letter." Hayden, 141 Wn.2d at 63. See also Bosko v. Pitts & Still, Inc., 75 Wn.2d 856, 864 (1969) ("[I]f an insurer denies liability under the policy for one reason, while having knowledge of other grounds for denying liability, it is estopped from later raising the other grounds in an attempt to escape liability, provided that the insured was prejudiced by the insurer's failure to initially raise the other grounds."). Whitney's allegations of bad faith and prejudice are considered in the context of each exclusion.

**1. Exclusion J**

Exclusion J provides: "This Crime Policy will not apply to loss of income, whether or not earned or accrued, or potential income, including interest and dividends, not realized by the

ORDER GRANTING IN PART CROSS-
MOTIONS FOR SUMMARY JUDGMENT - 10

Insured as a result of any loss covered under this Crime Policy." Dkt. # 32-1 at 64. The exclusion is inapplicable. Whitney is not claiming lost income but, rather, the theft of money it had in its coffers.

**2. Exclusion L**

Under Exclusion L, "indirect or consequential loss of any nature, including fines, penalties, multiple or punitive damages" are not covered. Dkt. # 32-1 at 64. Travelers' argument regarding this exclusion incorporates its discussion of direct and indirect loss under the insuring agreement. That argument has been rejected: the corresponding exclusion is inapplicable.

**3. Exclusion O**

Exclusion O bars coverage for, among other things, any loss or part of a loss, "the proof of which as to its existence or amount is dependent solely upon . . . a profit and loss computation . . . ." Dkt. # 32-1 at 65. Whitney has not relied upon, nor has the Court reviewed, any profit or loss computations when determining whether a loss exists or its amount. The exclusion is therefore inapplicable.

Whitney claims that the interposition of this exclusion in the midst of litigation caused prejudice because Whitney did not have adequate time to respond to the assertion of this ground for denial. The argument is unpersuasive in this particular context. No additional investigation or facts were necessary to address the applicability of Exclusion O. The claim of prejudice related to the need to pay an attorney to respond to the new argument is not the type of prejudice that triggers estoppel. Otherwise any failure to initially raise an exclusion would automatically cause prejudice.

ORDER GRANTING IN PART CROSS-
MOTIONS FOR SUMMARY JUDGMENT - 11

**4. Exclusion R**

Exclusion R provides: "This Crime Policy will not apply to loss resulting directly or indirectly from the giving or surrendering of Money . . . in any exchange or purchase, whether or not fraudulent, with any other party not in collusion with an Employee . . . ." Dkt. # 32-1 at 65. Whitney asserts that this language is "loosely worded and potentially ambiguous," quoting Am. Tooling Ctr., Inc. v. Travelers Cas. and Sur. Co. of Am., 895 F.3d 455, 464 (6th Cir. 2018), but does not identify an ambiguity in the circumstances presented here. If the exclusion is enforceable (see below), it excludes from coverage payments Whitney made for products and services associated with the company-wide vacation. As to those payments, the loss resulted from the surrender of money in a purchase transaction with an entity not in collusion with Davis.

Whitney argues that, even if Exclusion R is unambiguous, it is an attempt to get around Washington's efficient proximate cause rule and is therefore invalid. The efficient proximate cause rule applies only "when an insured peril sets other excluded perils into motion which in an unbroken sequence and connection between the act and final loss, produce the result for which recovery is sought." Kish v. Ins. Co. of N. Am., 125 Wn.2d 164, 169 (1994) (internal citation and quotation marks omitted). See also Vision One, LLC v. Phila. Indem. Ins. Co., 174 Wn.2d 501, 519 (2012) (the rule applies only when "two or more perils combine in sequence to cause a loss and a covered peril is the predominant or efficient cause of the loss.). The rule exists to prevent insurers from eviscerating coverage for an otherwise covered occurrence "merely because an uncovered peril appeared later in the causal chain," thereby "ensuring that an insurance policy offering indemnity for a covered peril will provide coverage when a loss is proximately caused by that covered peril." Xia v. ProBuilders Specialty Ins. Co., 188 Wn.2d

ORDER GRANTING IN PART CROSS-
MOTIONS FOR SUMMARY JUDGMENT - 12

171, 185 (2017).

There is no secondary peril in this case. The insuring agreement represents Travelers promise to pay for the loss of money caused by employee theft. Davis' theft - and therefore the insured peril - arose not when Davis changed entries in the ERP system or when Whitney's owners accepted Davis' representations and approved the bonuses and vacation, but rather when Whitney paid the bonuses to its employees and purchased the goods and services that made up the vacation. Exclusion R excludes the third-party purchases from coverage, but the purchases are not a separate peril. Rather, they are an essential part of the claimed theft loss. Where, as here, there is only one peril - loss caused by employee theft - the insured may not avoid a clear and unambiguous contractual exclusion that limits the type of recoverable damages arising from that peril. See Aqua Star (USA) Corp. v. Travelers Cas. and Sur. Co. of Am., 719 F. App'x 701, 702 (9th Cir. 2018).

As was the case with Exclusion O, the Court finds that Whitney has not demonstrated that the interposition of this exclusion in the midst of litigation caused prejudice.

//

//

//

ORDER GRANTING IN PART CROSS-MOTIONS FOR SUMMARY JUDGMENT - 13

## CONCLUSION

For all of the foregoing reasons, plaintiff's motion for partial summary judgment (Dkt. # 31) is GRANTED in part and DENIED in part. Travelers' Employee Theft policy provides coverage for the bonuses Whitney paid to its employees, but does not cover the third-party purchases it made related to the 2015 company-wide vacation. Whitney is, therefore, entitled to an award of $96,566.85 on its breach of contract claim. Defendant's motion for summary judgment on the breach of contract claim is GRANTED in part and DENIED in part: Travelers need not reimburse Whitney for the vacation expenses. Travelers' motion for summary judgment regarding the implied covenant and IFCA claims, which was dependent on the coverage determination, is DENIED.

Dated this 3rd day of January, 2020.

Robert S. Lasnik
United States District Judge